IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION

| | |
|---|---|
| LINDA LIND, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 05-4312-CV-V-NKL |
| ) | |
| MISSOURI EMPLOYERS MUTUAL ) | |
| INSURANCE COMPANY, ) | |
| ) | |
| Defendant. ) | |
| ) | |

ORDER

Plaintiff Linda Lind's ("Lind") employment was terminated after she and two younger employees competed for two positions when their employer, Defendant Missouri Employers Mutual Insurance Co. ("MEM"), went through a reduction in force. Lind subsequently filed suit for age discrimination under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 623, and the Missouri Human Rights Act, Mo. Rev. Stat. ch. 213. Pending before the Court is MEM's Motion for Summary Judgment [Doc. # 44]. For the reasons set forth below, the Motion is granted.

**I.** **Facts**

A reasonable juror could believe the following facts from the evidence placed before the Court, granting all reasonable inferences and resolving all disputes of fact in favor of Lind as the non-moving party. MEM provides workers' compensation insurance

1

to Missouri employers. Lind began working for MEM as a customer service representative at the age of 41 when the company first opened for business in 1995. During her tenure, she received annual raises and was promoted to Claims Service Manager in 2002. She received good performance evaluations every year and even earned a few awards for her service. During her tenure as Claims Service Manager, Lind hired Shawn Edwards and eventually promoted her to Claims Service Supervisor because she felt that Edwards would do a very good job in that role. Lind always gave Edwards good performance evaluations in her new position. In early 2004, Lind's Claims Service Manager position was eliminated and she accepted a new position as Medical Bill Pay Supervisor without any cut in pay. At the time, the Bill Pay division had a tremendous backlog and Lind was told to get things caught up.

In 2003, MEM decided that it needed to reduce its work force to cut expenses and improve efficiency. Part of the reduction involved the merger of several departments, including bill paying services, into a "one-stop-shop" customer service department. MEM wanted all employees retained in the new customer service department to be cross-trained in all the operations of the department so that each member could answer any question and do any job. The committee assigned to manage the restructuring determined that the new department should have one Customer Service Manager and two Customer Service Supervisors. A woman named Kacy Howell was chosen as the manager, and three other women–Lind, Shawn Edwards, and Julie Hague–applied for the two supervisor positions. All three knew that only two would be chosen, and each understood

2

the importance of outperforming the other two during the evaluation period between July 1, 2004 and November 19, 2004.

Whoever would be chosen for the two Supervisor positions, it would be their jobs to oversee all functions in the new customer service unit, to "learn new procedures and policies through training sessions . . . ; [to] assist in training customer service representatives or other coworkers on job duties; and [to] provide mentoring and coaching for the customer service staff." Lind Depo. at 90, 91, 95. It was incumbent upon these Supervisors to create their own timeframes for cross-training and to work the extra hours necessary to learn the different job functions. However, compared with her competitors, Lind's performance during the evaluation period was poor. She worked fewer hours than Edwards or Hague and seldom interacted with the customer service representatives. Lind did not cross-train in other areas because she spent all of her time paying bills.

During the evaluation period, MEM's backlog of work was so great that all hourly employees were required to work a minimum of five hours of weekly overtime. Because Customer Service Supervisors were salaried employees and exempt from overtime, Lind only felt obligated to work the minimum five to six extra hours required for the hourly customer service representatives. She admits that she chose not to compete with Edwards or Hague in terms of hours worked even though she knew such an effort would be impressive to management. "I wasn't competing in that area," she explained in her deposition. "I wasn't competing to work more than they did." Lind Depo. at 106. She rarely worked weekends, even though most employees did and it was made clear to her

3

that weekend hours were important; however, she did often work into the evening during weekdays. Howell, the Customer Service Manager, told Lind that "you're not working the overtime that [other employees are] working because you're not here on weekends…and that's what matters, they don't see you doing it." Lind Depo. at 134. Lind also spent less time walking around the department getting to know the employees than Edwards or Hague did, and she skipped a teambuilding exercise scheduled for the Unit because she had a personal appointment at the time.

Lind did not cross-train any employees on any of the functions performed in the new customer service unit, even in the bill pay unit where she spent most of her time. Some of the customer service representatives asked Edwards, who was doing the bill-pay cross training, why Lind was not training them and why she was not at the office on weekends with everyone else. They asked Edwards why Lind didn't at least come around to say "hi" to them. Lind states that she did not cross train others or herself because Howell told her to focus exclusively on bill paying; however, Lind also testified that she has no reason to believe that Howell's directives to focus on bill paying had anything to do with Lind's age.

Shawn Edwards went out of her way to establish relationships with staff and external departments. When Lind had been her supervisor, she frequently commented that Edwards exceeded expectations, was a team player, volunteered for any job or committee whether within her area or cross-functional, and that she treated everyone with dignity and respect. Lind Depo. at 60-63. During the evaluation periods, Edwards

4

cross-trained on the combined functions of the Merged Customer Service Unit. She made the time to do so by routinely coming into work early, staying at work late and working weekends. Edwards's rule of thumb was that if she were going to require her staff to be at work, she needed to be there too. She also found time to focus on bill pay while still accomplishing the other Customer Service Supervisor duties. Unlike Lind, Edwards cross-trained others on how to pay bills even though she had just recently learned to do so herself. She also cross-trained members of the Merged Customer Service Unit on claims intake. Indeed, Edwards was so productive and proactive in making the transition to the Merged Unit that Lind testified in deposition that she did not disagree with MEM's ultimate decision to award Edwards one of the Supervisor positions. Lind Depo. at. 130.

Julie Hague also excelled during the evaluation period. She came into work early, stayed late and worked weekends. She was cross-trained, and cross-trained others, on the combined functions of the Merged Customer Service Unit. In fact, because the policy department had used an entirely different computer system than the other units, Hague was responsible for training others on this system. She also trained others on how to answer policy phone calls and process policy workflows. Lind admits that Hague was the only one of the three individuals vying for the Supervisor position who had expertise in the policy holder customer service functions, but Lind also testified that Hague had no managerial experience and no experience in the mailing or the bill processing areas. However, Lind admits that she was never in a position to evaluate Hague's performance the way she had been with Edwards. She stated that she believes Hague was hired

5

essentially because she was from Howell's customer service division and Howell wanted to hire one of her own.

In choosing which two candidates would ultimately be chosen for the Customer Service Supervisor positions at the end of the evaluations period, MEM performed an assessment of each candidate. Customer Service Manager Howell determined a score for each candidate by weighting length of service as 10 percent of the final score, the past two years' performance appraisals at 45 percent, and demonstrated abilities during the six month evaluation period as the other 45 percent. Lind scored a 36 percent on the assessment as compared to Edward's 72 percent and Hague's 64 percent. Based on these scores, the two positions were awarded to Edwards and Hague. When MEM told Lind that her Customer Service Supervisor position was being eliminated as part of the reduction in force, it offered her continued employment as a Customer Service Representative. Lind declined. Her eliminated position was never reopened or filled by another employee.

Ron Jenks, Director of Human Resources, performed an analysis by age, race and sex. His analysis showed that the percentage of employees over forty both before and after the reduction in force remained nearly the same. During her entire employment with MEM, Lind never heard anyone make any comments about her age or anyone else's.

**II.     Discussion**

In her two Count complaint, Lind sues for violations of the ADEA and the MHRA. The Court examines both statutes under the same analysis. *See Swyers v. Thermal*

*Science*, 887 S.W.2d 655, 656 (Mo. Ct. App. 1994) ("In interpreting the MHRA, Missouri courts have adopted federal case law from Title VII cases as well as case law from other states interpreting analogous discrimination statutes."). The ADEA prohibits an employer from discharging "any individual or otherwise discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). Any individual who is at least forty years old is included in the protected class. *Id.* § 631. An ADEA plaintiff may show discrimination by either direct or indirect methods of proof. *Beshears v. Asbill*, 930 F.2d 1348, 1353 (8th Cir. 1991); *Blake v. J.C. Penney Co.*, 894 F.2d 274, 278 (8th Cir. 1990).

When an employee produces direct evidence that an illegitimate criterion such as age "played a motivating part in [the] employment decision," *Price Waterhouse v. Hopkins*, 490 U.S. 228, 258 (1989), then "the defendant may avoid a finding of liability only by proving by a preponderance of the evidence that it would have made the same decision even if it had not taken the [illegitimate criterion] into account." *Beshears v. Asbill*, 930 F.2d 1348, 1353 (8th Cir. 1991) (quoting *Price Waterhouse*). If there is no direct evidence that a discriminatory motive played a "motivating part in the employment decision," then the plaintiff may still show discrimination through the familiar, three-part burden shifting analysis of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 800-04 (1973). *Kneibert v. Thomson Newspapers*, 129 F.3d 444, 451 (8th Cir. 1997).

Lind argues that she has direct evidence that MEM terminated her employment due to age. Direct evidence is that which demonstrates a specific link between the

challenged employment action and the alleged animus. *Yates v. Rexton, Inc.*, 267 F.3d 793, 799 (8th Cir. 2001). In his deposition, MEM CEO Dennis Smith was asked whether reduction in force decisions were made strictly on a skills assessment basis or whether it was company "policy to consider other things such as prior experience, years of service?" Smith Depo. at 12:14-17. After an objection by counsel that the question was vague, unclear, and compound, Smith gave the following answer:

> Well, I would put it in the context of what I said originally, is that most of these evaluations, if not all, have been performed in relation to, as I said, people's length of service, their age and their skills and their skills assessment of their performance, if you will, within that skills assessment.
>
> So that is pretty much the way we operate in dealing with people – evaluating people's performance.

*Id.* at 12:21-13:5. Given that the listed criteria offered by Smith are generally positive traits, e.g., length of service and skills, and that the question eliciting the list gave examples of years of service and prior experience, it is not unreasonable to interpret Smith's use of the word "age" in a similar context to indicate how much experience a person had or had with the company. But the word could just as easily be taken literally to mean that the company generally considers the absolute age of an employee in making decisions about force reduction. Since the Court must assume all facts in Lind's favor for the purposes of summary judgment, the Court will assume that Smith's testimony reflects a company policy of considering age in its employment decisions. However, even given this assumption, there is no evidence linking his statement to the specific decision to make Edwards and Hague the customer service supervisors for MEM, let alone that such

a policy was the "motivating factor" in that decision. No reasonable juror under these circumstances could conclude that Howell, the primary decision maker, selected Edwards and Hague because of their age and not their better performance during the evaluation period. Thus, the *Price Waterhouse* burden shifting analysis does not apply.

Under the *McDonnell Douglas* test, a plaintiff must first make out a prima facie case for age discrimination. When the case involves a reduction-in-force rather than a replacement of an older employee with a younger employee, a plaintiff may make a prima facie case of age discrimination by establishing: "(1) she is within the protected age group; (2) she met the applicable job qualifications; (3) she suffered an adverse employment action; and (4) there is some additional evidence that age was a factor in the employer's action." *Stidham v. 3M*, 399 F.3d 935, 938 (8th Cir. 2005). Lind easily meets the first and third of these criteria: she was over forty at the time her employment was terminated, placing her in the protected age group, and she suffered an adverse employment action in her termination. The parties dispute whether Lind has offered prima facie evidence that she met the applicable job qualifications for the merged customer service unit because she did not cross-train herself in all the new combined areas and did not cross train other employees, but rather spent most of her time paying bills. MEM also notes that she didn't work as much overtime as the other two women applying for the position and didn't spend as much time being social with the other employees in the division. These latter two considerations, while they may have played a role in Howell's decision, do not suggest that Lind did not meet the applicable job

9

qualifications. Lind always had good performance evaluations before the restructuring and there is no indication in the record that she was not qualified to become one of the two new supervisors based on her past skills.

As to the fourth element, "some additional evidence that age was a factor in the employer's action," Lind may satisfy her prima facie burden by "by presenting either statistical evidence (such as a pattern of forced early retirement or failure to promote older employees) or circumstantial evidence (such as comments and practices that suggest a preference for younger employees)." *Id.* Smith's deposition testimony that age is a factor in force reduction decisions, though insufficient to show direct evidence of discrimination in Lind's case, suffices as "some additional evidence that age was a factor" for purposes of her prima facie case, albeit very attenuated. *Id.*

Having made out her prima facie case, the burden shifts to MEM to show a legitimate, non-discriminatory basis for MEM's decision about the customer service supervisor positions. *Thomas v. Corwin*, 483 F.3d 516 (8th Cir. 2007). Lind's reassignment occurred within the context of a reduction in force. Lind admits that MEM was reducing its workforce because it needed to save money by eliminating some employees. "A company's business decision to reduce its work force is a legitimate reason to discharge qualified employees." *Lewis v. Aerospace Cmty. Credit Union*, 934 F. Supp. 314, 320 (E.D. Mo. 1996) (citing *Hardin v. Hussman Corp.*, 45 F.3d 262, 265 (8th Cir. 1995) ("When a company's decision to reduce its workforce is due to the exercise of its business judgment it need not provide evidence of financial distress"). Given three

applicants and two Customer Service Supervisor positions, MEM went about filling those positions by evaluating the applicants in competition with one another. Of the three applicants for the two positions, Lind had the lowest score during the evaluation period. Thus, MEM has met is burden to show a legitimate, nondiscriminatory basis for letting her go.

Once an employer produces evidence of a non-discriminatory reason for its employment decision, the burden shifts back to the plaintiff to offer proof that would allow a rational fact-finder to conclude that the proffered reason was not the true reason for the employment action, and that age was. *Yates v. Rexton, Inc*., 267 F.3d 793, 800 (8th Cir. 2001) (citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507-08 (1993)). The ADEA does not authorize a court to judge the wisdom of a company's business decision to reduce its workforce in response to economic pressures. *See Holley v. Sanyo Mfg., Inc*., 771 F.2d 1161, 1166 n. 8 (8th Cir. 1985). However, even within the context of a legitimate reduction-in-force, an employer may not fire an employee because of his age. *Carlton v. Mystic Transp., Inc.*, 202 F.3d 129, 136 (2d Cir. 2000).

Thus, in order to avoid summary judgment at this stage of the *McDonnell Douglas* analysis, Lind must present evidence that (1) creates a question of material fact as to whether choosing the other two candidates over her was pretextual, and (2) creates a reasonable inference that age was a determinative factor in that decision. *Yates v. Rexton, Inc*., 267 F.3d 793, 800 (8th Cir. 2001); *Fisher v. Pharmacia & Upjohn*, 225 F.3d 915, 921 (8th Cir. 2000). The evidence that is available for these inquiries includes the

evidence that established Lind's prima facie case and the inferences properly drawn therefrom. *Yates*, 267 F.3d at 800. However, the Supreme Court has explained that

> plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false," will not "always be adequate to sustain a jury's finding of liability. Certainly there will be instances where, although the plaintiff has established a prima facie case and set forth sufficient evidence to reject the defendant's explanation, no rational factfinder could conclude that the action was discriminatory.

*Mayer v. Nextel W. Corp.*, 318 F.3d 803, 808 (8th Cir. 2003) (quoting *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 148 (2000).

Even assuming that Lind had produced sufficient evidence to raise a dispute of fact as to whether her low evaluation score were pretextual, she has offered no evidence from which a reasonable juror could find that the evaluation process was a pretext for age discrimination. Although CEO Smith stated in deposition that age was a factor in MEM's employment decisions, there is no evidence that Howell, who made the decision about Lind's employment, considered Lind's age. Rather, all the evidence produced suggests that Lind was not chosen because the other candidates were more impressive during the evaluation period. Lind admits that she made no effort to compete with Hague and Edwards in terms of hours worked, that she didn't feel it was necessary to spend any more overtime hours than the minimum required of hourly employees, and that she missed a teambuilding exercise with other employees during the evaluation period. The only evidence of pretext she has offered is that she wasn't allowed to cross-train herself or others because Howell told her to focus on paying bills. Even assuming that fact in her favor, there is no evidence that Howell did so because of Lind's age, as opposed to her

12

superior knowledge of bill payment systems. Moreover, even though Edwards and Lind were also directed to pay bills, they found time to do cross training themselves.

Lind has also stated in deposition that she finds no fault in awarding one of the positions to Edwards since Lind herself hired and trained Edwards and knows that she would make a good supervisor. Rather, Lind objects that Hague was chosen over her, even though Hague had relatively little experience compared to Lind, because Hague had previously been one of Howell's customer service representatives and they were close. Again, assuming this fact in Lind's favor, it does not suggest that the choice of Hague had anything to do with Lind's age. Further, Lind admits that she was never in a position to evaluate Hague's performance and has no evidence that she did not have a stronger performance during the evaluation period. At best, the evaluation process may have been skewed in favor of Hague–by requiring Lind to pay bills to the exclusion of other tasks which would have affected her score–because Howell liked Hague better. If that is the case, it bespeaks unprofessional conduct on Howell's part but it does not violate the ADEA. Federal courts do not "sit as super-personnel departments reviewing the wisdom or fairness of the business judgments made by employers, except to the extent that those judgment involve intentional discrimination" of protected classes. *Xuelin Zhuang v. Datacard Corp.*, 414 F.3d 849, 855 (8th Cir. 2005).

Lind never heard any age-based discriminatory comments while she worked for MEM. Indeed, she was hired at the age of 41 when she was already within the age group protected by the ADEA. She was offered a different position within the company when

13

she wasn't chosen for the Supervisor position, which she declined. Further, MEM's human resources director performed a statistical analysis which showed that the percentage of workers over 40 remained basically unchanged after the reduction in force. In short, there is no evidence from which a reasonable juror could find that Lind was not chosen because of her age.

## III. Conclusion

Accordingly, it is hereby

ORDERED that Missouri Employers Mutual Insurance Company's Motion for Summary Judgment [Doc. # 44] is GRANTED.

                                                s/ Nanette K. Laughrey
                                                NANETTE K. LAUGHREY
                                                United States District Judge

Dated: June 4, 2007
Jefferson City, Missouri